# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA,**
      Plaintiff,

      v.

**[1] ALEXANDER MIRANDA-RODRÍGUEZ,**
      Defendant.

CRIM. NO. 22-310 (ADC)

## REPORT AND RECOMMENDATION

On July 7, 2022, the Puerto Rico Police Bureau ("PRPB") executed two search warrants related to the defendant, Alexander Miranda-Rodríguez (the "defendant"). One search warrant was for the defendant's residence, located in the Montellano Ward, Dones Sector, in Cidra, Puerto Rico (the "Residence"), while the other search warrant was for a 2018 Jeep Grand Cherokee Laredo that the defendant was seen driving away from the Residence (the "Jeep Cherokee"). Inside the Jeep Cherokee, PRPB did not seize any contraband. However, inside the Residence, PRPB seized two (2) firearms, one of which had been converted to fire automatically as a machinegun, ninety-eight (98) rounds of ammunition, eleven (11) magazines (seven of which could be considered "high capacity" magazines), three (3) wrapped bundles of distribution-sized quantities of cocaine, drug paraphernalia, drug ledgers, and approximately $18,960 in U.S. currency. *See* Docket Nos. 26 at 4 and 53 at 5. *See also*, Govt. Ex. 9.

Presently before the Court is the defendant's *Franks*[1] motion requesting that the Court suppress the evidence found by the PRPB in the Residence because the affidavit (the "Affidavit")[2] submitted in support of the search warrant (the "Warrant")

---

[1] *Franks v. Delaware*, 438 U.S. 154 (1978).

[2] The substantive portions of the affidavits setting forth probable cause for the warrant for the Residence and the warrant for the Jeep Cherokee are identical. For that reason, hereinafter, both affidavits will be uniformly referred to as the "Affidavit."

purportedly contained false statements that the agent knew were untrue (the "*Franks* Motion").[3] For the reasons espoused more thoroughly below, the Court recommends that the defendant's *Franks* Motion be **DENIED**.

## I.    Procedural History

Based on the evidence seized during the execution of the Warrant at the Residence on July 7, 2022, the grand jury returned a five-count indictment against the defendant charging him with possession of a machinegun in furtherance of a drug trafficking crime, in violation of Title 18, *United States Code*, Section 924(c)(1)(B)(ii) (Count One), possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, *United States Code*, Section 924(c)(1)(A)(i) (Count Two), possession with intent to distribute a detectable amount of cocaine, in violation of Title 21, *United States Code*, Section  841(a)(1) (Count Three), possession of a machinegun, in violation of Title 18, *United States Code*, Section 922(o) (Count Four), and felon in possession of a firearm and ammunition, in violation of Title 18, *United States Code*, Section 922(g)(1) (Count Five) (the "Indictment"). *See* Docket No. 7.

On November 3, 2022, the defendant filed a *Franks* Motion seeking to suppress the evidence seized on July 7, 2022, and requesting that a *Franks* hearing be held to challenge the Warrant issued by a Puerto Rico Municipal Court Judge. Together with his *Franks* Motion, the defendant submitted an unsworn statement under penalty of perjury of Mr. José A. Meléndez-Cruz, a private investigator hired to conduct a field investigation of the area from which the investigating Puerto Rico Police Officer, Edwin A. Santiago-Martínez ("Agent Santiago-Martínez"), claimed to have conducted surveillance of the Residence. *See* Docket No. 21-1.

In his *Franks* Motion, the defendant claims that the Affidavit sworn out by Agent Santiago-Martínez and submitted in support of the two applications for a search warrant contained "false statements made knowingly and intentionally,

---

[3] Defendant's *Franks* Motion is entitled "Motion to Suppress Evidence." *See* Docket No. 21.

and/or with reckless disregard for the truth." *Id.* at 21, ¶21. The defendant even argued that, for the reasons explained in his *Franks* Motion, it is unlikely that Agent Santiago-Martínez actually conducted any of the surveillance that he describes in his Affidavit. *Id.* at 8, ¶22. On November 28, 2022, the government filed a "Response in Opposition to Defendant's *Franks* Motion." *See* Docket No. 26.[4] The matter was referred to the undersigned for the preparation of a Report and Recommendation. *See* Docket No. 25.

Given the uncertainty regarding what Agent Santiago-Martínez meant when he stated in his Affidavit that he situated himself in a "strategic point" to conduct the surveillance, and for other reasons having to do with the Agent's description of the Residence, the Court granted the defendant's request for a *Franks* Hearing, which was heard over a period of two days beginning on February 24, 2023, and concluding on March 7, 2023. *See* Docket Nos. 33 and 34.

Because the defense has the burden in a *Franks* hearing to prove the allegations of perjury or reckless disregard by a preponderance of the evidence (*see Franks*, 438 U.S. at 156), the defense presented its case first. During the hearing, the defendant called Agent Santiago-Martínez to the stand, followed by Mr. José A. Meléndez-Cruz. The defense then rested. The government then called United States Probation Officer Liara Martínez as its only witness.

At the conclusion of the presentation of evidence, the Court ordered the parties to file post-hearing briefs. The defendant filed his post-hearing brief on September 10, 2023, and the government filed its post-hearing opposition brief on November 6, 2023.

## II.   <u>Statement of Facts</u>

In his *Franks* Motion, the defendant claims that Agent Santiago-Martínez' description of the Residence to be searched in the Affidavit is "inaccurate, false and erroneous," and bears no resemblance to the actual house searched. *See* Docket No. 21

---

[4] The full title of the opposition filed by the government is "Response in Opposition to Defendant's *Franks* Motion and Requesting Denial of the Motion Without a Hearing." *See* Docket No. 26.

Case 3:22-cr-00310-ADC   Document 56   Filed 03/01/24   Page 4 of 24

*United States v. [1] Alexander Miranda-Rodríguez*                    Page 4
Report and Recommendation
Crim. No. 22-310 (ADC-MDM)

at 8, ¶21. He also claims that "it is highly improbable that Agent Santiago-Martínez could have observed all that he claims to have observed 'from [the] strategic point' without being extremely close to the Residence and without being seen by the defendant." *Id.* at 8, ¶22. The defendant further proffers that "there are only two (2) probable points from where Agent Santiago could have positioned himself so as to be in a 'strategic point' to conduct the surveillance," and from either of those two positions "it is humanly impossible to observe the entrance of the [r]esidence." *See* Docket No. 21 at 9, ¶25.

The government disputes such contentions and argues that "the defendant has not demonstrated that Agent Santiago[-Martínez] included a false statement [i]n the [ ] Warrant [either] intentionally or with reckless disregard for the truth because Agent Santiago[-Martínez] reasonably believed the information he wrote in the [W]arrant[]. Nor has the defendant met his additional burden of demonstrating that any false statements (in isolation or combination) were essential to the probable cause finding." Docket No. 53, at 6.

## A. The Affidavit in Support of the Warrant

On July 5, 2022, Agent Santiago-Martínez, badge number ending in xx190, appeared before Municipal Court Judge Sonya Nieves, assigned to the Court of First Instance, Caguas Part, and swore out the following facts in support of the application for the Warrant. *See* Docket Nos. 23-1, 23-2, 23-3, and 23-4.

> [O]n Tuesday, June 21, 2022 a telephone call was received at the Intelligence Division of the Caguas Area, with a male voice, who declined to be identified, said [sic] that he was worried because in his sector, located on the Montellano Ward, Dones Sector in Cidra, past the old, closed school, then past a bridge and one goes up and then enters on the second entrance to the right in the Dones Sector, fourth house to the right, first floor, the person said that a young man had moved in there, who the person described as white, average height, bald, with tattoos on both arms, he heard that he was called ["]Alexito.["] That he is accompanied [by] a young lady of black hair, young [sic], and that they had a Jeep SUV, of a dark color, its

license plate ending in ["]474["] The gentleman indicated that that [sic] he saw the young man always armed with a strange attitude [sic]. He said that the house is two stories and that the one on top has a yellow door. This information was received by Agent Marie Tere Rivera #35401 and that tip number 2022-023 was given to it.

[O]n Tuesday, June 28, 2022, [Agent Santiago-Martínez] went on duty at 9:00 am at the Caguas Intelligence Division and Sgt. Luis A. Rodríguez López, x-xx1350, assigned him the confidential complaint 2022-023 to investigate the same, assigning him the necessary team. Approximately at around 1:00 pm he went towards the above-mentioned place and around 1:40 pm, he arrived to [the] Dones Sector of [the] Montellano Ward, where the structure was located on a strategic point where he had plain view toward the first level where a Charcoal grey SUV Jeep and a tan pick-up were located, both were parked [in] reverse. He observed that the door of the second story is yellow. At around 2:00 pm he left the place. That same day, at around 6:30 pm, he placed himself in a strategic point where he had plain view toward the first level and where he observed that on the rural road of Dones Sector, there was a white, 4-door Lexus SUV parked, with license plate JMK-850 and that on the first level were parked the two vehicles he had previously observed parked in reverse. Approximately, at around 6:40 pm, an individual came out, white skin, average height, bald, shirtless, with tattoos on both arms, with a short jean [sic], who I [sic] was able to identify as Alexander Miranda Rodríguez aka ["]Alexito["], inasmuch as that person is identified as the enforcer of the Integral Plan of the area of Caguas, where I [sic] was able to observe on his waist protruding a long, black pistol magazine, he jumped the concrete fence, walked over [to] the Lexus vehicle, opened the trunk and extracted a white plastic bag, he closed the interior of the first level, where he was no longer seen. After approximately 5 minutes, I was able to observe that the front gate opened, apparently automatically and then I saw the lights of the Charcoal Grey, Jeep turn on, which came out of the first level at full speed, and it was not possible to see who was in it, for it had tinted windows. The license plate was not able to be taken down either. After this he left the place and went to the Intelligence Division

where he told Sgt. Rodríguez, x-x1350 what had been observed.

[O]n Wednesday, June 29, 2022, he went on duty at 9:00[am] at the Caguas Intelligence Division and Sgt. Luis A. Rodríguez López, x-x1350 gave him instructions to continue to investigate the confidential complaint 2022-023. At around 12:15 pm, he located himself in a strategic point where he had plain view of the first level of the structure, where he was able to observe that Alexander Miranda Rodríguez, aka ["]Alexito["], was coming out, dressed in a long-sleeved black shirt (tucked out) and long blue jeans, where he walked toward the fence and jumped the same. Upon falling on the other side of the fence, he was able to observe that he picked up his shirt and fit a black gun he had on his waist. He walked toward the charcoal grey Jeep SUV, license plate JBS 474, 4[-]door, got in on the driver's side, and left the place, his view was lost [sic]. He was able to observe that the white Lexus SUV was parked on the first level in reverse, next to the tan pick up. After these observations, [Agent Santiago-Martínez] left the place. He went to the Intelligence Division and told Sgt. Rodríguez what he had seen. And he gave him instructions to request a search warrant for the structure and another for the vehicle.

## B. The Evidentiary Hearing

### 1. *Testimony of PRPB Agent Edwin Santiago-Martínez*

The defense called as its first witness Agent Santiago-Martínez, who testified that he was a 23-year veteran of the Puerto Rico Police Bureau, assigned to the Caguas Area Intelligence Division. *See* Docket No. 38, Transcript ("Tr.") at 7. Agent Santiago-Martínez testified that on June 21, 2022, at approximately 10:00AM, the Caguas Area Intelligence Division had received an anonymous tip from someone who preferred not to be identified. The tipster stated that at Monte Llanos Ward in the Dones Sector, Road 173 at kilometer 16.1 in Cidra, a couple had moved in, that the male had a weird attitude, was always armed, and that the residents of the area were very concerned. Docket No. 38, Tr. at 15. The tipster described the man as "white skinned, bald with tattoos, and average height." *Id.* He was said to live with a young woman who had white skin and dark hair. The tipster also indicated that the couple

drove a dark colored truck whose license plate ended in "474," and they lived in the fourth house on the right in the first-floor level. *Id.* The tipster indicated that the upper level of the house had a yellow door. Agent Santiago-Martínez said the tip was assigned the number 2022-023 and that [the] information was received by Police Officer Maritere Rivera Rivera. *Id.*

Agent Santiago-Martínez further testified that on June 28, 2022, the Supervisor of the Caguas Area Intelligence Division, Sergeant Luis A. Rodríguez-López, instructed him to open an investigation into the anonymous tip and conduct surveillance. *Id.* Agent Santiago-Martínez explained that he was assigned an unmarked vehicle, a portable radio, and a pair of binoculars. *Id.* at 16. He also had with him his personal cellphone. *Id.* at 22. Agent Santiago-Martínez mentioned, however, that he was not assigned a partner nor any other officer to accompany him on the surveillance. *Id.* at 16.

In response to questions from defense counsel, Agent Santiago-Martínez described the area around the Residence as very "rural." "To get to the house, you have to go into a small road [off of Road 173] that . . . literally ends a little further down from this house." Docket No. 38, Tr. at 17. In other words, Agent Santiago testified that "you can't just drive down Road 173 and the house will pop up." *Id.* Instead, it is an area where the Dones family lives and there are only about four to five houses in that small community. *Id.* He explained that the road in front of the Residence is narrow and ends approximately four hundred meters further down. *Id.* at 18. Agent Santiago-Martínez testified that he is familiar with this area because he has lived in Cidra for 43 years and passed by that area "frequently." Docket 38, Tr. at 89.

Using a photo of the Residence to assist with his testimony, Agent Santiago-Martínez described the Residence as a "two-story structure," the second level of which appears to be under construction. The second level also has a yellow front door. *See* Govt. Composite Ex. 1.

The photo of the Residence entered into evidence shows that the first level is largely below street level as indicated in the Affidavit.[5] *See* Govt. Composite Ex. 1. It also shows that the first level opens on to a carport with space enough to park two cars side-by-side as described in the Affidavit. The area immediately over where the cars park is a make-shift zinc roof. The overall carport area, not all of which is covered by the zinc roof, is bordered on the left (when facing the house) by a concrete wall that is mostly below street level. The cement wall runs perpendicular away from the house and is approximately seven (7) feet tall where it connects to the Residence and approximately four (4) feet tall where it ends at the left outside corner of the carport.[6] Perpendicular to where the cement wall ends at the left outside corner of the carport begins a metal gate made of white horizontal iron bars. The horizontal bars on the gate are thick enough and spaced far enough apart such that they can easily be used to climb the gate like a ladder. The white metal gate continues to run across the entire front width of the property, ending at the outside right corner of the carport. See Govt. Composite Exhibits 1 at 4, 1(b), 1(c) and 1(d). The metal gate provides ingress and egress to the carport and opens to the inside from right to left when facing the Residence. *Id.* The metal gate does not have a motor to assist it in opening or closing. Docket No. 43, Tr. at 204, lines 7-15.

In response to further questioning from defense counsel, Agent Santiago-Martínez explained that the entrance door to the first floor of the Residence is located under the zinc roof and is actually a sliding glass door, not an "aluminum door" as described by Agent Santiago-Martínez in the Affidavit. He also clarified that to the right of the sliding glass door is a French-style glass window, not a "Miami-style"

---

[5] This description is provided by the Court as it attempts to capture in words what the Residence looks like in the photo that was entered into evidence. *See* Govt. Composite Ex. 1.

[6] The Court itself is choosing to use the  description "outside left corner" and "outside right corner" "of the carport to best describe the area based on the photos that were admitted into evidence during the hearing. Those terms were not used as such by any witness who testified during the hearing.

*United States v. [1] Alexander Miranda-Rodríguez*
Report and Recommendation
Crim. No. 22-310 (ADC-MDM)

Page 9

window as described in the Affidavit.[7] On the right exterior side of the house, he explained that there are three Miami-style windows that are not visible from the "strategic point" where he conducted his surveillance. The photos entered into evidence show that the wall with the Miami-style windows is exposed, un-plastered cinderblock as indicated in the Affidavit. *See* Govt. Composite Ex. 1 at 8.

During his testimony, Agent Santiago-Martínez explained that on June 28, 2022, he arrived at the Residence around 1:40PM and took-up a "strategic" position where he had a "plain view" towards the first level of the Residence. Using a photo of the area immediately surrounding the Residence, Agent Santiago-Martínez identified the exact location of the "strategic point" he assumed, which was directly in front of, and up the hill from, the Residence. He said that he stood inside a patch of vegetation where he was able to look down into the carport area of the Residence. *See* Docket No. 38, Tr. at 25-28. Though he had binoculars in his car, Agent Santiago-Martínez said he did not need to use them because he was so "close." *Id.* at 23. Agent Santiago-Martínez stayed at the Residence conducting surveillance for approximately 20 minutes and then left after seeing no activity. *Id.* at 23 & 25.

Later that same day, around 6:30PM, Agent Santiago-Martínez returned to the Residence and assumed the same "strategic" position in the vegetation in front of the Residence. At approximately 6:40PM, Agent Santiago-Martínez said he saw a white-skinned male with tattoos, wearing jean shorts and no shirt, whom he recognized to be the defendant, "Alexito," exit the Residence. *See* Docket No. 38, Tr. at 24 & 31. After the defendant exited the Residence, Agent Santiago-Martínez said he saw him approach the outside left corner of the carport where the concrete wall

---

[7] The official translation filed by the defendant at Docket No. 23-1 does not mention a "Miami-type window" to the right of the aluminum door. The English translation, therefore, is wrong on a key point relied upon by the defendant. Instead, the English translation reads "a white window to the right side." *See* Docket No. 23-1, at 1 and 2. The original Spanish text on pages 1 and 2, however, reads as follows: "UNA VENTANA TIPO MIAMI COLOR BLANCA HACIA EL LADO DERECHO." *See* Docket No. 23-2, at 1 and 2. (Emphasis in original). The Court will nevertheless discuss this issue as if the English translation had properly included the "Miami-type" description of the window to the right of the door.

meets the metal gate. He then jumped over the wall[8] and because he did not have a shirt on, Agent Santiago-Martinez was able to see that he had a firearm magazine protruding from the "front part" of his waist area.[9] *See Id.* at 123, lines 13-25. The defendant then walked across the narrow street to a white Lexus vehicle that was parked facing the direction of where Agent Santiago-Martínez was positioned. He saw the defendant open the trunk of the Lexus and take out a white plastic bag. *Id.* at 77. The defendant then closed the trunk, walked towards the cement wall, and jumped over it again.[10] *Id.* at 128, line 15, through 129, line 4. He then went back inside the Residence. *Id.* at 77. Five minutes later, the defendant got in the Jeep Cherokee and exited the carport at full speed. *Id.* at 134, lines 11-12.

In response to questions from defense counsel, Agent Santiago-Martínez admitted that the metal gate did not have a motor though he had mentioned in his Affidavit that it "opened, apparently automatically." *Id.* at 79. He remained at the Residence for approximately ten more minutes and left around 6:50PM. *Id.* at 141.

Agent Santiago-Martínez said he did not arrest the defendant at that moment, nor did he take any photos or videos of the events. He simply left a few moments later and reported his findings to his Supervisor. His Supervisor instructed him to "continue the investigation." *Id.* at 35.

The next day, June 29, 2022, at approximately 12:15PM, Agent Santiago-Martínez returned to the Residence and once again assumed a "strategic position" in the vegetation up the hill in front of the Residence. *Id.* at 37. Again, he had his binoculars in his car, but he did not use them. *Id.* at 42, lines 10-13. He said he saw

---

[8] Agent Santiago-Martínez testified that the defendant "put his foot on the gate and he launches himself over the cement wall." Tr. at 125, lines 21-25. Then, in response to more specific questions from the Court, Agent Santiago-Martínez explained that the defendant put his foot on one of the metal bars of the gate, his hands on top of the wall, and threw his feet over the gate to the left and landed on the other side. Tr. at 126, lines 2-10.

[9] In response to questions from counsel for the government, Agent Santiago-Martínez noted that he did not see the handle of a pistol, just the magazine. Tr. at 123.

[10] Agent Santiago-Martínez testified that he saw the defendant "put both hands on the top of the cement wall, put his feet on the top of the wall and he jumps to the other side." He didn't climb down the gate. Tr. 128, line 22, through 129, lines 4.

the defendant, dressed in "long blue jeans" and a "long black shirt" (*Id.* at 142), jump the wall/gate in the same spot as the previous day but when he landed on the other side, he "straighten[ed]" his shirt in such a way that Agent Santiago-Martínez could see that he had a black firearm in his waistband. He also saw the defendant "arrange his gun" in his waistband. *Id.* at 142. The defendant then crossed the narrow street and got into the Jeep Cherokee and left. *Id.* at 43. Agent Santiago-Martínez stayed for approximately ten minutes more, then left the scene. *Id. Iat* 143-44

On Sunday, July 3, 2022, Agent Santiago-Martínez returned to the Residence a third time, only this time he was in his personal vehicle. *Id.* at 162. The purpose of the third visit was to jot down details of the Residence that he had missed before and to provide the finishing touches for the search warrant. *Id.* at 58. He explained that he entered the property through the back after having parked on the street in front of the Residence. He said he was most interested in being able to describe the right side of the Residence that wasn't visible during his surveillance. *Id.* at 57-62.

On cross examination by counsel for the government, Agent Santiago-Martínez described a video that he had made depicting the route that he took to approach the Residence on June 28 and 29, 2022, where he parked his official vehicle while he conducted the surveillance, and exactly where he stood during the surveillance. *See* Ex. 3. *See also* Docket No. 38, Tr. at 113-121.

In response to doubts raised by the defense as to why the defendant might have chosen to jump over the cement wall/metal gate rather than open the metal gate, Agent Santiago-Martínez testified that on the day the search warrant was executed, July 7, 2022, there was a medium-sized[11] pit-bull-breed dog roaming loose in the carport area.

Based on the above, probable cause developed during the two days of surveillance, and Sgt. Rodríguez-López instructed Agent Santiago-Martínez to seek a search warrant for the Residence and the Jeep Cherokee.

---

[11] Agent Santiago-Martínez testified that the dog was big enough for his body to reach "a little over his knee area." "The head would be a little bit higher." Docket No. 38, Tr. at 133.

The Residence was described in the Affidavit as follows:

> Structure: it contains two stories made of concrete, painted white. The second story is under construction and has a yellow door. The first story, which will be searched and seized, is described by me as follows: it is below street level. On the front of the structure there is a fence built in cement with iron bars. Parking space with a zinc roof. Looking at it from the front, *it contains a main white aluminum door toward the left side* and *a white [Miami-style]*[12] *window to the right side*. On the right side of the structure, there are three double, white Miami style windows on blocks without plaster. All of this located in the Montellano Ward, Dones Sector, Road 173 km. 16.1, interior, first level (below), in Cidra. (Emphasis added).

The Jeep Cherokee, meanwhile, was identified in the Warrant according to its Department of Transportation registration information: a "2018, four-door, *light blue* Jeep Grand Cherokee Laredo, license plate JBS-474." (Emphasis added).

### 2. *Testimony of Private Investigator José Meléndez Cruz*

Mr. José Meléndez-Cruz ("Meléndez") took the stand as defendant's second witness and testified that for approximately the past ten years, he has been working as a private investigator licensed in the Commonwealth of Puerto Rico. *See* Docket No. 43, Tr. at 196. Prior to that, he worked as a Puerto Rico police officer for approximately twenty-two-and-a-half years. Twelve of those twenty-two-and-a-half years were spent as a Task Force Officer with the Drug Enforcement Administration ("DEA"). *Id.* at 250, lines 14-15. He also earned a Master's Degree in Forensic Investigation. *Id.* at 196, lines 22-23.

Mr. Meléndez explained that he was hired by the defendant to perform an investigation regarding the possible locations surrounding the Residence from which Agent Santiago-Martínez could have conducted his surveillance. *Id.* at 197. In essence, he sought to identify the "strategic point" that Agent Santiago-Martínez referenced in his Affidavit. Mr. Meléndez explained that he visited the Residence on

---

[12] The bracketed language was not included in the English translation although it was contained in the original Spanish version.

September 29, 2022, some three months after Agent Santiago-Martínez conducted his surveillance. *Id.* at 198 & 217.

　　While conducting his investigation, Mr. Meléndez took the opportunity to measure the cement wall that borders the left side of the carport and confirmed that it is seven (7) feet tall where it meets the Residence, and four (4) feet tall where it meets the metal fence. *Id.* at 202 & 204. He also confirmed that the metal gate does not have a motor and must be opened and closed manually. *Id.* 202.

　　Mr. Meléndez also testified about three or four different places around the Residence where he stood to see if it was possible for Agent Santiago-Martínez to stand and still have a clear view of the Residence. *Id.* at 209-227. *See also* Def. Composite Ex. 10.  His conclusion was that there were *only* two locations where one could stand and still see what Agent Santiago-Martínez claimed to have seen in the Affidavit. *Id.* One location was just a couple of feet in front of the white metal gate, where he could have easily been seen by the defendant, while the other location was up the hill, slightly further to the left of the actual strategic point where Agent Santiago-Martínez stood.[13] Mr. Meléndez described the location as being "near the red wall." *See* Def. Ex. 10(f). After concluding Mr. Meléndez' testimony, the defense rested.

### 3. *Testimony of U.S. Probation Officer Liara Martínez*

　　The government then called as its only witness, U.S. Probation Officer ("USPO") Liara Martínez. *See* Docket No. 43, Tr. at 259. Officer Martínez testified that she has been a USPO since 2021 and she knows the defendant because she was responsible for supervising him while on supervised release from March 21, 2022 through April 8, 2022. Officer Martínez confirmed that on March 28, 2022, the defendant had reported a change of address to the address of the Residence and that she had conducted a home visit at that new address. *Id.* at 261. She also confirmed that during a home visit to the Residence, the defendant had a "very big" pit-bull that

---

[13] That is to the left while facing the Residence.

she asked to move to the bathroom because it presented a security risk. *Id.* at 264.
The government then rested its case.

## III.  <u>Discussion</u>

### A. Legal standard under *Franks v. Delaware*

The Fourth Amendment protects "[t]he right of the people to be secure in their
persons, houses, papers, and effects, against unreasonable searches and
seizures . . . ." *U.S. Const. amend. IV. See also United States v. Gifford*, 727 F.3d 92,
98 (1st Cir. 2013). With limited exceptions, it requires police officers to secure a
search warrant supported by probable cause prior to effectuating a search or seizure.
*United States v. Paneto,* 661 F.3d 709, 713 (1st Cir. 2011). Probable cause exists when
the totality of the circumstances suggests that "there is a fair probability that
contraband or evidence of a crime will be found in a particular place." *United States
v. Hicks,* 575 F.3d 130, 136 (1st Cir. 2009) (quoting *United States v. Felíz,* 182 F.3d
82, 86 (1st Cir. 1999)) (internal quotation marks omitted).

Information supporting probable cause for a warrant is often set forth in an
affidavit provided by a law enforcement officer, as happened in this case. *See
United States v. Rigaud,* 684 F.3d 169, 173 (1st Cir. 2012). A warrant supported by
an affidavit, moreover, is presumptively valid. *Id.* But, if a defendant makes a
"substantial preliminary showing that a false statement . . . with reckless disregard
for the truth[ ] was included by the affiant in the warrant affidavit, and if the
allegedly false statement is necessary to the finding of probable cause, the Fourth
Amendment requires that a hearing be held at the defendant's request." *Franks v.
Delaware,* 438 U.S. 154, 155-56, (1978) *See also United States v. Barbosa,* 896 F.3d
60, 68 (1st Cir. 2018). If the defendant demonstrates at the evidentiary hearing, by
preponderance of the evidence, "perjury or reckless disregard" by the affiant sufficient
to nullify the court's finding of probable cause, "the search warrant must be voided
and the fruits of the search excluded," unless there is a different basis for probable
cause in the warrant besides the false statements. *United States v. Graf*, 784 F.3d 1,
8 (1st Cir. 2015).

Case 3:22-cr-00310-ADC   Document 56   Filed 03/01/24   Page 15 of 24

*United States v. [1] Alexander Miranda-Rodríguez*                    Page 15
Report and Recommendation
Crim. No. 22-310 (ADC-MDM)

Generally speaking, an allegation is made with "reckless disregard for the truth" if the affiant "in fact entertained serious doubts as to the truth of the allegations or where circumstances evinced obvious reasons to doubt the veracity of the allegations in the application." *Burke v. Town of Walpole,* 405 F.3d 66, 81 (1st Cir. 2005) (quoting *United States v. Ranney,* 298 F.3d 74, 78 (1st Cir. 2002)) (internal quotation marks omitted). "In the case of allegedly material omissions, recklessness may be inferred where the omitted information was critical to the probable cause determination." *Town of Walpole,* at 81–82 (internal quotation marks omitted).

### B. The Record before the Court does not support defendant's contention that it would have been impossible for Agent Santiago-Martínez to conduct surveillance in the neighborhood in and around the Residence.

The crux of defendant's claim in his *Franks* Motion is that Agent Santiago-Martínez lied by including false statements in his Affidavit in support of the Warrant when he described the surveillance that he conducted of the Residence on June 28 and 29, 2022. The defendant contends initially that, in fact, the agent did not conduct any surveillance of the Residence at all because, in the opinion of Private Investigator Meléndez ("PI Meléndez"), there were only two locations from which surveillance could have been conducted and from neither of those two locations could the Agent have seen what he says he saw in the Affidavit. The Court disagrees with PI Meléndez' conclusion. The evidence presented during the *Franks* hearing demonstrates that a third location was used by Agent Santiago-Martínez, which did, in fact, provide him with an expansive view of the Residence from whence he could have observed the conduct detailed in the Affidavit.

As a threshold matter, the Court finds that Agent Santiago-Martínez' demeanor during the hearing was measured and appropriate under the circumstances and he did not appear to be defensive in any way. Indeed, his in-court testimony was sufficiently detailed such that it appeared as though, at times, he was reliving the events in his head as he was testifying to them on the stand.

The Court finds, furthermore, that Agent Santiago-Martinez' testimony regarding the exact location where he conducted his surveillance of the Residence was not only credible, but it was also corroborated by other evidence presented during the hearing. For example, it appears wholly reasonable for Agent Santiago-Martínez to have conducted his surveillance from the "strategic point" identified in the photos that were admitted into evidence as Exhibits 1(a) & 3, which was just up the hill from the front of the Residence in and among the vegetation overlooking the carport, because that location gave Agent Santiago-Martínez a clear view of the entire Residence. It also allowed him to remain sufficiently hidden among the vegetation so as not to be detected by the defendant. That location is also duly aligned with one of the locations that PI Meléndez indicated would provide a reasonable view of the Residence and of the conduct described in the Affidavit.

In addition, based on the testimonial, photographic, and video evidence presented during the hearing, that "strategic" location in and among the vegetation up the hill from the Residence was not so far away such that an agent highly experienced in dealing with firearms would have difficulty identifying a pistol magazine protruding from the waistline of a shirtless individual. This is especially true considering the fact that the agent was alerted beforehand by an anonymous tipster of the possibility that the defendant would be armed. Nor is it unreasonable to believe that that same experienced agent could have recognized an individual adjusting a firearm in his waistband after having jumped over the cement wall.

Indeed, the Court notes that, if nothing else, Agent Santiago-Martínez' credibility is bolstered by the fact that he freely admitted to *not* using binoculars as part of his surveillance, even though he had them in his car. Indeed, if Agent Santiago-Martínez had testified that he had used the binoculars, he certainly would have made it more difficult for the defendant to have claimed impossibility in conducting the surveillance. In this case, however, the defendant freely admitted to not using them on either day of the surveillance, and as a result, made a statement against his interest. The Court understands therefore that Agent Santiago-Martínez

Case 3:22-cr-00310-ADC   Document 56   Filed 03/01/24   Page 17 of 24

*United States v. [1] Alexander Miranda-Rodríguez*                     Page 17
Report and Recommendation
Crim. No. 22-310 (ADC-MDM)

testified truthfully as to the surveillance conducted and that he was close enough to the Residence not to need the assistance of binoculars.

In conclusion, and contrary to the opinion of PI Meléndez, the Court finds that there were more than two possible locations from which surveillance of the Residence could have been conducted. The Court therefore finds that it was not impossible for Agent Santiago-Martínez to have conducted surveillance from the "strategic" location up the hill from the Residence in and among the vegetation, which gave him a "plain view" of the Residence to observe that which he described in the Affidavit.

### C. None of the discrepancies in the description of the Residence or the Jeep Cherokee are material to the state court's determination of probable cause for the Warrant.

The defendant next contends that the physical description of the Residence and the Jeep Cherokee included in Agent Santiago-Martínez' Affidavit in support of the Warrant are so deficient and so detached from reality that it is unlikely that Agent Santiago-Martínez ever really conducted surveillance of the Residence. For the reasons that follow, such an inference has no factual basis in the record.

Furthermore, even if the Court were to agree with the defendant that Agent Santiago-Martínez lied in his Affidavit, which it does not, and it were to strike all of the discrepancies cited by the defendant, there would nevertheless still be probable cause to issue the Warrant. *United States v. Spinosa*, 982 F.2d 620, 627 (1st Cir. 1992) ("We need not decide whether the misrepresentations and omissions were made either knowingly or recklessly because, as the district court held, even had the affidavit been revised to reflect the misrepresentations and omissions of which [the defendant] complains, there would nevertheless have been probable cause to issue the warrant."); *see also United States v. Ramos*, No. 06-0114, 2006 U.S. Dist. Lexis 95668, at *5 (D.P.R. Aug. 25, 2006) (Vélez Rivé, J.) ("A [*Franks*] hearing will be denied if defendant has failed to make the requisite substantial preliminary showing that absent the false information the affidavit contained insufficient evidence to support a finding of probable cause."). The discrepancies alleged by defendant address

facts which are not essential to the court's probable cause finding, either in isolation or in combination with one another. The Court explains.

In its *Franks* Motion, the defendant pinpoints the following facts from Agent Santiago-Martínez' Affidavit as being false and inaccurate:

1. That the main entrance door to the Residence on the first floor is a "white aluminum door," with a "Miami-type window to the right side." Docket No. 21 at 12, ¶¶29-30.

2. That the right side of the structure is untarnished (i.e., un-plastered with exposed cinderblocks) and has three double "Miami-type white windows." Docket No. 21 at 12, ¶¶29-30.

3. That the white metal gate "opened automatically" even though it has no motor. Docket No. 21 at 15, ¶33.

4. That because the Warrant for the Jeep Cherokee was directed towards a "light blue" Jeep Grand Cherokee Laredo, rather than a "Charcoal Grey" one, it is defective, illegal, and invalid. Docket No. 21 at 17, ¶35.

The Court addresses each alleged discrepancy in order.

   1. *The "White Aluminum" main entrance door and "Miami-type window to the right side."*

The Court acknowledges, as does the government, that Agent Santiago-Martínez' description of the main entrance door and the adjacent window in the Affidavit is incorrect. As the photos admitted during the hearing clearly demonstrate, the main entrance door is a sliding glass door with white trim, and not a "white aluminum" door. *See* Govt. Composite Exhibit 1 at 6 & 7. Similarly, the window to the right of the main entrance door is not a "Miami-type window," but rather a normal glass window with white trim that matches exactly the style of the sliding glass door. Notwithstanding this error in the description of the shape and style of the door and the window, the fact nevertheless remains that Agent Santiago-Martínez correctly identified the location of both the door and the window in the Affidavit, thereby corroborating the place from which the defendant was seen exiting the Residence.

Case 3:22-cr-00310-ADC   Document 56   Filed 03/01/24   Page 19 of 24

*United States v. [1] Alexander Miranda-Rodríguez*                                              Page 19
Report and Recommendation
Crim. No. 22-310 (ADC-MDM)

Furthermore, any mistake in the description of the shape and style of the door and the window is decidedly immaterial to the question of probable cause. Indeed, the case law is clear that "to show that the evidence presented to the magistrate was not 'truthful' in the *Franks* sense, '[a]llegations of [police] negligence or innocent mistake are insufficient.'" *Hernández-Cuevas v. Taylor*, 723 F.3d 91, 102 (1st Cir. 2013) (quoting *Franks*, 438 U.S. at 171).

In this case, the error in the description of the main entrance door and the window to the right of the door appears to be nothing more than an innocent mistake or at worst, negligence. But even if the Court were to find that the error in the description of the main entrance door and window rose to the level of an outright lie, which it does not, striking those details from the Affidavit would have no effect on the Court's ultimate determination as to probable cause for the Warrant. For that reason, the defendant's challenge to the Affidavit on this ground is **DENIED**.

> 2. *The right side of the structure is untarnished (i.e., un-plastered with exposed cinderblocks) and has three double "Miami-type white windows."*

The defendant next claims that Agent Santiago-Martínez lied in his Affidavit when he mentioned that the right side of the Residence/structure[14] is made of un-plastered exposed cinderblock and there are three double "Miami-type white windows." *See* Docket No. 21 at ¶30. The defendant goes on to allege that "the only tarnished[15] (sic) wall is located on the left side of the [R]esidence and this wall has no "Miami" type windows." Docket No. 21 at 12, ¶30. *See also* Def. Composite Exhibit 10 at 1 & 4.

The Court notes at the outset that, factually speaking, Agent Santiago-Martínez' description of the right side of the Residence is spot on. The right side of the structure is indeed made of un-plastered cinderblock, and it does have three double Miami-type windows. *See* Govt. Composite Ex. 1 at 8. Indeed, it is apparent

---

[14] For purposes of this section, the terms "Residence" and "structure" are interchangeable.

[15] The Court understands the term "tarnished" to mean "plastered."

that the defendant raised this allegation because prior to the evidentiary hearing, the defendant misunderstood what was meant by "the right side of the structure." Docket No. 21 at 12, ¶29. Based on statements made in his *Franks* Motion, it appears that the defendant mistakenly thought that "the right side of the structure" made reference to the right side of the carport, which admittedly consists of dense vegetation only.

Nevertheless, Agent Santiago-Martínez credibly explained during the hearing that because he could not see the right side of the structure from his strategic location, he had to return to the Residence on Sunday, July 3, 2022 to jot down details of the Residence that he had missed before and to provide the finishing touches for the Warrant. The Court finds Agent Santiago-Martínez' testimony regarding this point to be highly credible considering the fact that the correct description of the right side of the structure was indeed included in the Affidavit. Moreover, because the right side of the Residence could not be seen during the surveillance, the only way for the correct description to have ended up being included in the Affidavit was for Agent Santiago-Martínez to have returned to the Residence sometime between June 29, 2022 and July 5, 2022, which was the day he swore out the Affidavit before the state court judge. Defendant's attempt to attack Agent Santiago-Martínez' credibility based on these allegations is simply unavailing.

The Court finds that Agent Santiago-Martínez accurately described the right side of the Residence and therefore the Affidavit is not untruthful in that regard. Defendant's challenge to the Affidavit on this second ground is, therefore, **DENIED**.

3. *The white metal gate "opened automatically" even though it has no motor.*

The defendant next alleges that Agent Santiago-Martínez lied in his Affidavit when he said that on June 28, 2022, he "was able to observe that the front *gate opened, apparently automatically* and then [he] saw the lights of the Charcoal Grey, [sic] Jeep turn on, which came out of the first level at full speed, and it was not possible to see who was in it, for it had tinted windows." Docket No. 23-1 at 2. The reason the

defendant claims the agent lied was because the metal gate did not have a motor to assist it to open or close.

In this case, the record is clear that Agent Santiago-Martínez did not have the intent to falsify any statement or to omit any critical information from the Affidavit. On the contrary, Agent Santiago-Martínez was forthright with the Court when he swore out the Affidavit sending a clear message that while he was sure that the gate *did* open, he wasn't sure just *how* it opened. Either way, Agent Santiago-Martínez's decision to use the word "apparently" to qualify the word "automatically" indicates a deduction on his part or an inference that he reached based on his observations.

Such was the case in *United States v. Lanza-Vázquez*, 799 F.3d 134, 141-42 (1st Cir. 2015), wherein the court recognized the ability of law enforcement officers to make obvious and natural inferences based on their observations when swearing out an affidavit for a search warrant. *Id.* at 142.

In *Lanza-Vázquez*, Agent Cedeño submitted a search warrant wherein he indicated that he saw the defendant and other individuals entering and exiting an apartment even though Agent Cedeño could not technically see the entrance to the defendant's apartment because the door was obstructed by a concrete staircase. *Id.* at 141.

On appeal, the First Circuit affirmed the district court's denial of the *Franks* motion noting that,

> [There was] [n]o evidence [to support[] Galán's belief that [Agent] Cedeño had any intent to falsify statements or to omit critical information, nor can we even say that there were any actual falsehoods in the affidavit. The circumstances also do not suggest that Cedeño was somehow reckless in writing "entering/exiting" instead of the more precise "I inferred that he entered or exited."
>
> *    *    *
>
> We note that accepting this clear and obvious inference on this record is entirely consistent with the broader purposes underpinning *Franks*: to ensure that a warrant judge has adequate information to make a decision, and to dissuade officers from misrepresenting their observations. At its

> core, this requires that the officer is being "truthful in the
> sense that the information put forth is believed or
> appropriately accepted by the affiant as true." *Franks*, 438
> U.S. at 165, 98 S. Ct. 2674. Here, the warrant judge had
> sufficient and accurate information with which to base a
> decision, and nothing in the affidavit (or from the hearing
> transcripts) leads us to question Cedeño's belief in the
> statements he provided.

*Id.* at 142.

In this case, the circumstances are similar. Agent Santiago-Martínez saw the gate open, but he didn't see *how* it opened. He nevertheless inferred, based on his observations, that it must have opened "automatically." Nowhere in the affidavit did the agent tell the Court that the gate did in fact open automatically or that there was a motor to activate the gate; only that it *may have* opened automatically. Accordingly, because there is nothing in the Affidavit, nor anything in the record, to cause this Court to question Agent Santiago-Martínez' belief in the statement he provided, the Court finds no support for the contention that the Agent lied in his Affidavit.

In addition, and alternatively, even if the Court were to strike from the record Agent Santiago-Martínez' statement that the metal gate "apparently opened automatically," the Affidavit would nevertheless still support a finding of probable cause. Given that fact, the defendant's challenge to the Affidavit based on this third ground is also **DENIED**.

> 4. *Because the Warrant for the Jeep Cherokee was directed towards a "light blue" Jeep Grand Cherokee Laredo, rather than a "Charcoal Grey" one, it is defective, illegal, and invalid.*

In his *Franks* Motion, the defendant challenged the validity of the search warrant issued for the 2018 Jeep Cherokee Laredo claiming that it was directed at a "light blue" Jeep Cherokee, rather than a "Charcoal Grey" Jeep Cherokee. As such, the defendant argued that the warrant for the vehicle is defective, illegal, and invalid.[16]

---

[16] The entire discussion regarding the challenge to the search warrant for the Jeep Cherokee was contained in paragraph 35 of the *Franks* Motion. *See* Docket No. 21 at ¶35.

During the *Franks* Hearing, evidence was heard regarding the defendant being seen leaving the Residence in a "Charcoal Grey" Jeep Cherokee. The evidence deduced during the hearing and through the briefs also indicated that no incriminating evidence was recovered by law enforcement from the search of the Jeep Cherokee.

At the conclusion of the *Franks* Hearing, the parties were instructed to file post-hearing briefs, which the defendant did at Docket No. 49. In his post-hearing brief, however, there is no discussion related to the validity of the search warrant for the Jeep Cherokee. Therefore, given the apparent abandonment of the argument and given the fact that no evidence was seized as a result of the search of the Jeep Cherokee, the Court finds that any challenge to the validity of the search warrant for the Jeep Cherokee is moot, or in the alternative, waived. *United States v. Zannino*, 895 F. 2d 1, 17 (1st Cir. 1990) (recognizing "the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.)[17]

## IV.   <u>Conclusion</u>

In light of the above, the Court finds that the defendant has not met his burden by a preponderance of the evidence to demonstrate that Agent Santiago-Martínez included a false statement intentionally or with reckless disregard for the truth in his Affidavit in support of the Warrant. For that reason, the Court hereby **RECOMMENDS** that defendant's *Franks* Motion (Docket No. 21) be **DENIED**.

**IT IS SO RECOMMENDED**.

---

[17] It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. As [the First Circuit] said in a closely analogous context: "Judges are not expected to be mindreaders. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace." *Zannino*, at 17.

The parties have fourteen days to file any objections to this Report and Recommendation. Failure to file the same within the specified time waives the right to appeal this Report and Recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150-51 (1st Cir. 1994); *United States v. Valencia Copete*, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 1st day of March 2024.

<u>*s/Marshal D. Morgan*</u>
MARSHAL D. MORGAN
UNITED STATES MAGISTRATE JUDGE